813 A.2d 643

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**David Allen FIRMAN, Jr., Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 10, 2002.

Decided Dec. 31, 2002.

Bryan Scott Neft, for David Allen Firman, Jr.

David R. Crowley, Bellefonte, for The Pennsylvania Association of Criminal Defense Lawyers.

Kevin Francis McCarthy, Pittsburgh, for Commonwealth of Pennsylvania.

Nicholas J. Staffieri, Robert Michael Waller, Philadelphia, for Southeastern Pennsylvania Transportation Authority.

Terrance R. Henne, Pittsburgh, Albert G. Feczko, Bethel Park, for Port Authority of Allegheny County.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

Justice SAYLOR.

We allowed appeal to consider the scope of the extraterritorial jurisdiction vested in officers of the Port Authority Police Department of Allegheny County.

Pursuant to the Railway and Street Railway Police Act,[1] certain corporations and authorities, including the Port Authority of Allegheny County, are authorized to apply (via the State Police Commissioner) for the commissioning by the Governor of persons designated to act as transportation system policemen. *See* 22 Pa.C.S. § 3301.[2] The Port Authority Police Department of Allegheny County was established in the exercise of such prerogative by the Port Authority.

On July 24, 1999, an on-duty Port Authority police officer was traveling on a public highway in a marked cruiser, en route from a downtown station to a patrol assignment on the West Bus-way (a dedicated, mass transit roadway). An automobile operated by Appellant, David Firman, Jr., abruptly swerved, causing the officer also to swerve and to brake to avoid a collision. The transportation system officer then observed Firman's vehicle changing lanes erratically and traveling at an excessive rate of speed, prompting him to initiate a traffic stop and administer field sobriety tests.[3] Based on his

1. Act of November 23, 1982, P.L. 686, No. 196 (as amended, 22 Pa.C.S. §§ 3301–3305) (the "Act").

2. Facially, the statute designates the officers as "railroad or street railway policemen," *see, e.g.,* 22 Pa.C.S. § 3301, although, as discussed below, their core authority corresponds to the broader system of transportation.

3. There is no dispute in this case concerning the sufficiency of the circumstances to justify a traffic stop by a police officer having primary jurisdiction in the geographic area of the encounter.

observations, as well as Firman's failure to adequately perform the tests, the officer arrested Firman and transported him to a Pittsburgh police station, where two breathalyzer tests were administered, indicating blood alcohol content of .193 and .211 percent, respectively. Firman was charged with two counts of driving under the influence of alcohol and two summary Vehicle Code violations.

Firman filed a pre-trial motion to suppress all physical evidence resulting from his arrest, contending that the Port Authority officer's statutory authority did not extend to making arrests on public roads. In granting Firman's motion, the common pleas court observed that, in *Commonwealth v. Mundorf,* 699 A.2d 1299 (Pa.Super.1997), the Superior Court deemed the extraterritorial authority of Port Authority police limited to actions that are undertaken while officers are on routine patrol and which prevent an immediate threat to the welfare of Port Authority passengers or property. *See id.* at 1302. The suppression court also took note of the Superior Court's admonishment against general enforcement of criminal laws or the Vehicle Code by Port Authority police. *See id.* While expressing the view that *Mundorf* deserved to be reexamined by the appellate courts, and emphasizing that the transportation system officer's actions prevented potential harm to motorists, the common pleas court nevertheless concluded that suppression was warranted, since the officer was neither on Port Authority property nor acting to prevent an immediate threat to the authority's passengers or property. The Commonwealth filed an interlocutory appeal as of right, certifying that the suppression court's order substantially hindered or effectively terminated the prosecution.

The Superior Court reversed in a divided, *en banc* opinion. *See Commonwealth v. Firman,* 789 A.2d 297 (Pa.Super.2001). The majority opened its discussion with an overview of the enabling provisions of the Act, in particular, Section 3303, which establishes the powers and duties of transportation system police as follows:

(a) **General powers.**—Railroad and street railway policemen shall severally possess and exercise all the powers of a

police officer in the City of Philadelphia, in and upon, and in the immediate and adjacent vicinity of, the property of the corporate authority *or elsewhere within this Commonwealth while engaged in the discharge of their duties in pursuit of railroad, street railway or transportation system business.*

22 Pa.C.S. § 3303(a) (emphasis added). Characterizing the *Mundorf* panel's reading of this statute as *dicta* and rejecting it, the *en banc* majority explained that the plain terms of the Act authorize the extraterritorial exercise of police powers by Port Authority police, not merely when confronted with an immediate threat to passengers or property, but also in the broader range of circumstances in which officers are discharging their official duties and observe offenses.[4] *See Firman,* 789 A.2d at 302 (indicating that application of *Mundorf's* approach would "unduly constrain the authority conferred by the legislature upon [Port Authority] officers in this Commonwealth"). Applying this interpretation, the majority concluded that, since the transportation system officer was on duty and properly traveling from one Port Authority property to another when he observed Firman's erratic driving, he possessed the requisite authority to effectuate the stop and arrest. *See id.* at 301.

The dissent, on the other hand, reasoned that the unambiguous language of Section 3303(a) restricts the circumstances in which Port Authority police may exercise police powers and effectuate arrests. *See Firman,* 789 A.2d at 303 (Johnson, J., dissenting). The dissent explained that:

> [t]he phrase "while engaged in the discharge of their duties," critical to any consideration of this section, recognizes that an officer's discharge of specific duties consistent with the business of the Port Authority is a prerequisite to his exercise of any of the powers otherwise provided by this Act. This conditional nature of the officer's powers is

4. Although in the course of its discussion the majority stated that the arresting officer in the present case was "on routine patrol" at the time of his encounter with Firman, *see Firman,* 789 A.2d at 301, this appears to be a misstatement, since the court separately acknowledged that the officer was merely on duty and en route to his patrol assignment. *See id.* at 298.

established by the legislature's use of the conjunction "while" in relation to the noun "discharge." The plain meaning of these two words allows a Port Authority officer to exercise lawful powers *during that time that* he *acts to remove the obligation or liability* imposed by his duties. By virtue of the same language, the Act establishes that if the officer's conduct is not motivated by the need to remove his obligation to the Port Authority or is not carried out during the appropriate timeframe, it is not in accordance with the [Act].

*Id.* at 303–04 (citation omitted; emphasis in original). Thus, according to the dissent, "[t]he duties of the officer are, perforce, limited by the business of the Port Authority itself." *Id.* at 304. The dissent then examined the nature of Port Authority business, as defined in the Second Class County Port Authority Act, 55 P.S. §§ 551–563.5, explaining:

The act describes, with exhaustive care, the "rights or powers" of the Port Authority, including specifically the manner of "business" in which it may engage. *See* 55 P.S. § 553. In none of section 553's twenty-seven subsections, has the legislature vested the Authority with the power to patrol public roadways not operated as high occupancy vehicle lanes.... Although section 553(15) provides the Port Authority with discretion "[t]o do all acts and things necessary for ... the general welfare of the authority to carry out the powers granted to it by this act or any other acts[,] 55 P.S. § 553(15), neither this section nor the provisions of the Railway and Street Police Act suggest that the Port Authority's exercise of police powers on public roadways is "necessary." Indeed, without some demonstrated relationship between the exercise of such expansive powers and the welfare of the Port Authority, I find it pointedly unnecessary.

*Id.* The dissent also endorsed *Mundorf* as setting forth the appropriate restrictions on extraterritorial arrest powers of Port Authority police. *See Firman,* 789 A.2d at 304–05 (Johnson, J., dissenting).

Presently, Firman advances the position of the Superior Court dissent, contending that any connection between transportation system business and Firman's arrest is simply absent. The Commonwealth maintains that the Act's extraterritorial term should be given the same effect as that of the Municipal Police Jurisdiction Act, see 42 Pa.C.S. § 8953, which permits municipal officers to make extraterritorial arrests, *inter alia*, for offenses involving breach of peace, when on "official business." *See* 42 Pa.C.S. § 8953(a)(5). The Commonwealth also argues that, if this Court were to find a requirement to establish some nexus to transportation system business or its ridership as a condition to the lawful exercise of a Port Authority police officer's extraterritorial jurisdiction, such requirement is satisfied in the present circumstances, because Firman nearly struck a Port Authority vehicle, thus creating an imminent threat to authority personnel and property.

Recently, *McKinley v. Commonwealth,* 564 Pa. 565, 769 A.2d 1153 (2001), assessed the extraterritorial jurisdiction of members of the Harrisburg International Airport police force afforded by the General Assembly via legislative grant to the Department of Transportation. In the inquiry, we considered the model of municipal police jurisdiction, which incorporates both a concept of primary jurisdiction (authority derived from the employer-municipality and constrained by the geographical area corresponding with its territorial limits) and a separate direct grant of authorization to arrest outside the territorial limits of the employer-municipality, subject to legislatively defined limits directed to specific purposes. *See id.* at 576–77, 769 A.2d at 1160 (citing 42 Pa.C.S. § 8953). As part of our analysis in determining that the jurisdiction of the airport police was solely of the derivative variety, we surveyed other statutes governing the jurisdiction of security personnel and observed, *inter alia,* that statutes that confer power throughout the Commonwealth tend to include limitations on the exercise of authority outside an officer's primary jurisdiction. *See id.* at 578, 769 A.2d at 1161 (citing 42 Pa.C.S. § 325.215 and 42 Pa.C.S. § 8953).

■ This case is distinguishable from *McKinley*, because the Act plainly includes aspects of both primary or derivative jurisdiction ("Railroad and street railway policemen shall severally possess and exercise all the powers of a police officer in the City of Philadelphia, in and upon, and in the immediate and adjacent vicinity of, the property of the corporate authority"), and a distinct, direct grant of extraterritorial authority ("or elsewhere within this Commonwealth while engaged in the discharge of their duties in pursuit of railroad, street railway or transportation system business").[5] Nevertheless, *McKinley's* observations concerning legislative practices relating to restraints on extraterritorial jurisdiction are relevant and dovetail with the central reasoning of the Superior Court dissent in the present case. In particular, we agree with the dissent that, by conditioning the grant of extraterritorial jurisdiction on engagement in the discharge of duties in pursuit of transportation system business, the General Assembly intended to require a closer connection between the interests of the transportation system and encounters in which police powers are to be exercised than mere "on-duty" status of transportation system police on the observation of offenses. Consistent with the dissent's reasoning, we find this interpretation to be supported by: the plain terms of the Act; reference to the specialized meaning of transportation system business determined by reference to the Second Class County Port Authority Act, *see* 55 P.S. § 552(13); and the policy underlying the Act, namely, the maintenance of security of the transportation system and its charges.[6]

**5.** The Act is also distinguishable from the statute at issue in *McKinley*, in that the Act requires transportation system officers to undergo the same intensive training as municipal officers. *See* 22 Pa.C.S. § 3303(d). *See generally McKinley*, 564 Pa. at 580 n. 13, 769 A.2d at 1162 n. 13 (referencing such distinction). Parenthetically, Firman makes no contention that the arresting officer lacked the requisite training.

**6.** We acknowledge the Commonwealth's argument analogizing the Act's provisions to municipal police jurisdiction; however, as noted above, the extraterritorial jurisdiction of municipal police officers is also of a limited variety, constrained according to prescribed circumstances. *See* 42 Pa.C.S. § 8953. This also supports reading the Act's extraterritorial provision as more particularly directed to specialized function

■ However, we credit the Commonwealth's alternative argument. In circumstances in which a motorist's conduct on a public highway jeopardizes Port Authority personnel, property, or passengers (here, the transportation system officer and the authority vehicle that he was operating), we conclude that a sufficient connection to transportation system business arises such that extraterritorial jurisdiction of Port Authority policemen is implicated.[7] Once police power is so enabled, absent a sufficient break in the encounter, its exercise may continue through an investigatory stop and/or arrest,[8] where otherwise warranted.

Accordingly, the order of the Superior Court is affirmed.

than is the "official business" requirement contained within one subset of the circumstances enabling extraterritorial powers of municipal police. *See* 42 Pa.C.S. § 8953(a)(5).

We do not dispute the concurring opinion's position that a Port Authority policeman can fairly be considered to be acting within the scope of transportation system business while he is affirmatively in the act of traveling between duty locations. The question presented on review of the Superior Court's opinion, however, is whether this status is maintained when the officer diverts from his assigned task of traveling to the new duty location because he has observed a violation or offense potentially unrelated to transportation system business and removed from Port Authority property. Under the express provisions of the statute, the officer's general police powers simply are not implicated in such circumstances, since the extraterritorial encounter must itself be within the scope of the officer's duties in pursuit of transportation system business. *See* 22 Pa.C.S. § 3303(a) (authorizing the exercise of police powers solely "while engaged in the discharge of their duties in pursuit of railroad, street railway or transportation system business"). Transportation system business has not been defined so broadly by the General Assembly as to encompass broad, general enforcement of the Motor Vehicle and/or Criminal Codes extraterritorially by an on-duty transportation system officer enroute to a patrol assignment, as the concurrence suggests. The specific "in pursuit of transportation system business" limitation on the officers' extraterritorial powers thus confirms that the Legislature did not intend for authority resources to be directed to such ends absent the requisite connection to authority interests.

7. In this regard, there is no requirement in Section 3303 that at such time an officer be engaged in routine patrol.

8. This is not to say that the Act authorizes statewide hot pursuit by transportation system police. Significantly, the provision enabling municipal police power to engage in hot pursuit is limited to offenses committed within the officer's primary jurisdiction, *see* 42 Pa.C.S. § 8953(a)(2), and it is evident that the Legislature did not intend for

Chief Justice ZAPPALA files a dissenting opinion.

Justice CAPPY files a concurring opinion.

Justice EAKIN did not participate in the consideration or decision of this case.

CAPPY, Justice, concurring.

I agree with the majority that Section 3303(a) of the Railway and Street Railway Police Act ("Act"), 22 Pa.C.S. § 3303(a), authorized Matthew Porter, a police officer with the Port Authority of Allegheny County ("Port Authority") to stop and arrest Appellant. I do not, however, agree with the majority's reasoning.

As this case raises a question of statutory construction, Pennsylvania's Statutory Construction Act applies. 1 Pa.C.S. §§ 1901–1991. According to 1 Pa.C.S. § 1921(a), the object in any statutory construction case is to ascertain and effectuate the intention of the General Assembly. Under 1 Pa.C.S. § 1903(a) and § 1921(b) respectively, a statute's words and phrases are to be construed according to their common meaning and approved usage, and where the words of a statute are clear and free from ambiguity, the letter of the statute may not be disregarded under the pretext of pursuing its spirit.

In relevant part, the Act confers full police powers within the Commonwealth upon Port Authority officers who have undergone the requisite training "while engaged in the discharge of their duties in pursuit of ... transportation system business." 22 Pa.C.S. § 3303(a).[1] For me, Section 3303(a)'s words are clear and unambiguous, and mean that a Port Authority officer may exercise such powers while he is fulfilling a responsibility that his position requires of him. There-

Port Authority police to have greater authority than municipal police. Here, however, it appears that the transportation system officer reasonably committed to break off the encounter due to Firman's excessive rate of speed, but was nonetheless able to overtake Firman because of delaying traffic conditions. *See* N.T., Feb. 16, 2000, at 4, R.R. at 14a.

1. Under the Act, Port Authority officers have and may exercise all the powers of City of Philadelphia police officers, and must complete the same course of instruction required of municipal police. 22 Pa.C.S. § 3303(a),(d).

fore, I believe that Officer Porter was authorized under Section 3303(a) to stop and arrest Appellant simply because Officer Porter "was engaged in the discharge his duties in pursuit of ... transportation system business" within the statute's plain meaning when he was traveling on the Fort Pitt Bridge en route from a Port Authority station to an assignment on a Port Authority bus-way.

I take issue with the majority's construction of Section 3303(a) because it essentially adds to the statute's terms. That is to say, I disagree with the majority's decision to condition an officer's exercise of the authority that Section 3303(a) gives him upon the establishment of "a sufficient connection to [Port Authority's] transportation system business", (Majority Opinion at 8), and to base Officer Porter's authority to take action on the fact that Appellant's conduct jeopardized Port Authority personnel and property. Moreover, insofar as Officer Porter was performing a function of his position, I view him as having been on "transportation system business", and, therefore, I disagree with the majority's reference to Officer Porter's "mere 'on-duty' status" and the role that the majority envisions this phrase to play when the courts construe Section 3303(a)'s extraterritorial jurisdiction standard hereafter. (Majority Opinion at 7–8).

In my view, the majority's analysis of Section 3303(a) does not arise out of the Act's language nor does it effectuate the legislature's intent, but rather, improperly reflects the majority's conception of the extraterritorial jurisdiction that Port Authority officers should possess.

I would, therefore, affirm the order of the Superior Court for the reasons that the Superior Court stated.

Chief Justice ZAPPALA dissenting.

I agree with the view expressed by Judge Johnson in his dissenting opinion below that the port authority officer here was not "engaged in the discharge of [his] duties" as required by 22 Pa.C.S. § 3303, when he stopped Appellant. Thus, I dissent based upon his well reasoned opinion.