**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Jason K. QUAID, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 7, 2004.

Filed March 17, 2005.

Gary Lysaght, Harrisburg, for appellant.

Daniel W. Stern, Asst. Dist. Atty., New Bloomfield, for Com., appellee.

BEFORE: BENDER, PANELLA and MONTEMURO *, JJ.

OPINION BY BENDER, J.:

¶ 1 This is an appeal from a judgment of sentence imposed upon Appellant after he was convicted of possession of drug paraphernalia and a small amount of marijuana. Appellant raises one question in this appeal, whether a Norfolk Southern Railroad Police Officer may lawfully stop a motor vehicle for general enforcement of the Motor Vehicle Code on a public highway when there is no nexus to railroad property or passengers except the mere presence of railroad tracks in close proximity to a highway? We vacate Appellant's judgment of sentence.

¶ 2 The trial court recites the relevant facts thusly:

On August 22, 2003, at approximately 3:14 a.m. during his patrol, Norfolk Southern Police Officer [Randall] Sloan observed defendant in his vehicle weaving across the double yellow and white lines of the road in Perdix, a township adjacent to Marysville. Officer Sloan is employed by the Norfolk Southern Railroad Company and regularly assists the Marysville Police Department. Officer Sloan continued to observe defendant and followed him heading towards Marysville. Thereafter, Officer Sloan contacted the Marysville Police Department and stopped defendant upon entering Marysville. Immediate [sic] after Officer Sloan walked up to the driver's side of the vehicle to speak with defendant, Police Officer Carl Lehman of the Marysville Police Department arrived to take charge of the inquiry. Upon speaking with defendant and retrieving his license, registration, and insurance, Officer Lehman smelled a strong odor of marijuana from inside the vehicle. When he had defendant step out of his vehicle, he notice [sic] a bulge in defendant's pants pocket. He patted down defendant for officer safety and recognized the bulge in defendant's pocket as a marijuana smoke pipe. When he seized the pipe out of defendant's pocket, he also found a plastic bag with a small amount of marijuana with the pipe. Officer Sloan escorted defendant and his passenger to the Marysville Police Department.

Trial Court Opinion, 3/18/04 at 1–2.

¶ 3 Based upon the above, Appellant was charged with possession of drug paraphernalia and a small amount of marijuana. Prior to trial, Appellant filed a motion to dismiss asserting that the stop of Appellant by Officer Sloan was unlawful. A hearing on Appellant's motion was held on February 17, 2004, in which the testimony of Officers Sloan and Lehman was taken and argument was heard on the question of Officer Sloan's authority to stop Appellant. On March 8, 2004, the court denied

---

* Retired Justice assigned to the Superior Court.

Appellant's motion to dismiss. Appellant proceeded to a non-jury trial and was convicted of the above recited offenses. Appellant subsequently filed the present, timely appeal.

■ ¶ 4 Prior to addressing the merits of Appellant's contention we must address a claim of waiver. The Commonwealth contends that, for purposes of this appeal, Appellant waived any claim of illegality in the stop by Officer Sloan by failing to aver with specificity the basis of the grounds for suppression. We will admit that Appellant's motion to dismiss is rather broadly worded.[1] Indeed, while the motion is essentially a motion to suppress, it is entitled a "motion to dismiss." Nevertheless, it is beyond dispute that the Commonwealth was fully aware of the basis of Appellant's objection at the time of the hearing on February 17, 2004.[2] At the beginning of the proceeding, District Attorney Charles Chenot, III, states:

> We're here today on a defense motion to dismiss charges. And if I understand it correctly, alleging that Norfolk Southern Police Officer Randy Sloan, who made the initial stop in this case, was not authorized to make the stop. I believe I've stated it correctly, Mr. Lysaght. [Defense counsel].

N.T. Suppression Hearing, 2/17/04, at 3. The parties then conducted a full suppression hearing, complete with argument on the central issue, that being Officer Sloan's authority to stop Appellant. Notably, the Commonwealth raised no objection to the form or content of the "motion to dismiss" at the hearing.

¶ 5 The Commonwealth cites *Commonwealth v. Bradshaw*, 324 Pa.Super. 249, 471 A.2d 558 (1984), for the proposition that Appellant's failure to state, with greater specificity, the grounds relied upon for suppressing evidence renders his current challenge waived. We disagree.

¶ 6 In *Bradshaw*, the home of Mr. and Mrs. Glenn Limburg was burglarized on January 25, 1980, in Bucks County. Bradshaw was arrested the next day in Philadelphia when he attempted to use a credit card belonging to Mrs. Limburg. A search of Bradshaw's person yielded many items that had been taken in the burglary including a wallet and some credit cards. Three days later, on January 29, 1980, Middletown Township (Bucks County) Police Detective Richard Denchant filed a criminal complaint in Bucks County charging Bradshaw with the January 25th burglary. Subsequently a detainer was lodged in Philadelphia County as Bradshaw had remained in the custody of police in Philadelphia after his arrest there. Bradshaw was made available to Bucks County police officers on February 8, 1980, on which date he was arrested on the burglary charges.

¶ 7 Bradshaw subsequently filed, in Bucks County, "a motion to suppress the evidence seized from him 'prior to and incident to and subsequent to the arrest' on February 8, 1980. Appellant did not, however, specifically challenge or refer to either the arrest or seizure which occurred

---

1. Appellant's Motion to Dismiss Charges contained 5 numbered paragraphs. The first four paragraphs essentially recite the relevant facts and the fifth asserts "[t]he traffic stop and detention by Norfolk Southern Police Officer Sloan was unlawful as was the resulting search conducted by Officer Lehman." Appellant's Motion to Dismiss Charges, ¶ 5. The Motion does not assert a lack of jurisdiction or authority to stop on the part of Officer Sloan.

2. Although Appellant's motion was entitled a motion to dismiss, the notes of testimony refer to the proceeding of February 17, 2004, as a "Suppression Hearing." Thus, it would seem that the parties were treating the proceeding as a suppression hearing.

on January 26, 1980," in Philadelphia. *Id.* at 559. At the suppression hearing, in response to Appellant's motion, the Commonwealth produced only the affidavit of probable cause for arrest and presented the testimony of Detective Dechant. "The Commonwealth did not, however, present evidence at the suppression hearing to establish that any searches or seizures were valid. Detective Dechant, who was subjected to cross-examination, testified that no items were seized from appellant on February 8, 1980, the date appellant referred to in the motion to suppress." *Id.* "As a result of appellant's failure to attack specifically the seizure of January 26, the suppression hearing judge, the Honorable Edmund B. Ludwig, denied appellant's motion to suppress." *Id.*

¶ 8 On appeal, the appellant, focusing upon items seized on January 26, 1980, in Philadelphia contended that:

> the suppression court was in error when it denied appellant's motion to suppress. The essential thrust of this claim is that since the suppression court heard no testimony as to how evidence was seized, the Commonwealth failed to meet its burden of showing that the evidence was legally obtained.

*Id.* We disagreed, concluding, in essence, that barring a more specific assertion of the grounds relied upon for suppression, the Commonwealth was not derelict with respect to the burden of showing that the evidence was legally obtained and that the court did not err in denying the motion. In other words, barring a more specific allegation, it was not incumbent upon the Commonwealth "to prove the legality of all its investigatory techniques," *id.* at 560, or of all evidence seized. Notably, proving in Bucks County the legality of the arrest and search which occurred in Philadelphia would have required bringing in out-of-county witnesses.

¶ 9 The thrust of *Bradshaw* is that when a motion to suppress is not specific in asserting the evidence believed to have been unlawfully obtained and/or the basis for the unlawfulness, the defendant cannot complain if the Commonwealth fails to address the legality of the evidence the defendant wishes to contest. The present case differs substantially from *Bradshaw* as apparently the Commonwealth was not only aware of the basis relied upon to support the suppression motion,[3] it was fully prepared to offer testimony in support of its burden and did in fact offer testimony to support the stop of Appellant. If Appellant were now raising a suppression argument that had not been specifically addressed at the suppression hearing, *Bradshaw* would compel affirmance. Here, however, where the matter was specifically litigated and addressed by the trial court, *Bradshaw* is simply inapplicable. While Appellant should have drafted a more specific motion, where the Commonwealth did not object to the content or form of the motion at the time of the hearing, where the Commonwealth was apparently on notice as to the issue to be litigated, and where it fully participated in the proceeding, there is simply no basis for finding waiver.

¶ 10 Turning now to the legality of the stop of Appellant by Officer Sloan, in *Commonwealth v. Dowds*, 563 Pa. 377, 761 A.2d 1125, 1128 (2000), our Supreme Court recited the standard of appellate review in the following manner:

> Our review of a suppression ruling is limited to determining whether the record as a whole supports the suppression court's factual findings and whether the

---

**3.** It is entirely possible that discussions between counsel took place prior to the hearing so that the Commonwealth was fully apprised of the basis relied upon.

legal conclusions drawn from such findings are free of error.

¶ 11 Notably, as a Norfolk Southern Railroad Police Officer, Officer Sloan was vested with the police powers granted him by the Railroad and Street Railway Police Act (Act), §§ 22 Pa.C.S.A. 3301–3305. This Act grants authority to railroad police officers in the following vein:

**§ 3303. Powers and duties.**

(a) General powers.—Railroad and street railway policemen shall severally possess and exercise all the powers of a police officer in the City of Philadelphia, in and upon, and in the immediate and adjacent vicinity of, the property of the corporate authority or elsewhere within this Commonwealth while engaged in the discharge of their duties in pursuit of railroad, street railway or transportation system business.

¶ 12 We first addressed the jurisdictional limitations upon police officers commissioned under the Act, and specifically the implications of the phrase, "while engaged in the discharge of their duties in pursuit of railroad, street railway or transportation system business," in *Commonwealth v. Mundorf,* 699 A.2d 1299 (Pa.Super.1997). In *Mundorf,* a Port Authority Transit (PAT) Police Officer, Matthew Porter, was on duty and was proceeding from the Gateway Subway Station in downtown Pittsburgh to the East Liberty Garage. To get to the East Liberty Garage, Porter was driving along Fifth Avenue in the outbound bus lane used by Port Authority buses when he encountered defendant, driving in front of him in the outbound bus lane. At that point on Fifth Avenue, the road has three lanes, two inbound lanes open to regular traffic and the outbound bus lane, which is a lane restricted to PAT vehicles and emergency vehicles. The "bus lane" is not open to regular vehicles, in effect making Fifth Avenue, in the stretch under consideration, a one-way street (in the opposite direction) for regular traffic. After encountering the vehicle in the restricted lane, Officer Porter stopped the driver, Mundorf, and soon suspected him of driving under the influence. Mundorf was arrested but, prior to trial, filed a motion to suppress asserting that Officer Porter lacked statutory authority to make the traffic stop under the circumstances of the case. The court granted Mundorf's motion and the Commonwealth appealed. We reversed, concluding that Officer Porter:

"was on routine patrol" driving a PAT vehicle from one PAT property to another in a traffic lane reserved exclusively for the use of PAT or emergency vehicles. Although the Act does not define the precise duties to be executed by railway policemen, we note the uncontradicted suppression hearing testimony of Officer Porter that his job was "to make sure the bus lanes are clear of other traffic, to clear the other traffic out of the bus lanes if there is traffic."

*Id.* at 1301.

¶ 13 Despite reaching the above conclusion we opined that the extension of such a police officer's authority was limited. We stated:

We caution, however, that it is only under facts similar to those in the instant case, where the officer is on routine patrol and acts to prevent an immediate threat to the welfare of PAT passengers or property, that we will validate an arrest conducted pursuant to the second provision of section 3303(a). Our decision in no way sanctions the authority of railway officers to engage in the general enforcement of our criminal laws or Motor Vehicle Code.

*Id.* at 1302.

¶ 14 In *Commonwealth v. Firman,* 789 A.2d 297 (Pa.Super.2001)(en banc)(*Firman*

*I* ), this Court again addressed a motor vehicle stop made (apparently) by the same PAT Police Officer, Matthew Porter, on a public roadway in the city of Pittsburgh. In *Firman*, Porter was on his way from the PAT station to the West Busway, a limited access roadway/expressway designed primarily for PAT buses and vehicles. While entering an on ramp to the Fort Pitt Bridge in downtown Pittsburgh, a vehicle driven by Firman swerved toward Porter's police car, nearly hitting it. After entering the bridge, Firman's car sped off at a high rate of speed, changing lanes as it approached the Fort Pitt Tunnel. Officer Porter pursued Firman's vehicle and stopped it shortly after exiting the tunnel. After Officer Porter interacted with Firman, Officer Porter developed a suspicion that Firman was under the influence of alcohol. Firman failed filed sobriety tests and was arrested for driving under the influence. Prior to trial, Firman filed a motion to suppress. The court granted Firman's motion concluding that the stop by PAT Police Officer Porter was illegal as Porter exceeded his statutory authority in stopping Firman on a public roadway.

¶ 15 On appeal, this Court reversed. While it was conceded that Officer Porter was not on PAT property at the time of the stop, nor on property "in the immediate and adjacent vicinity" to PAT property, the Majority of the Court concluded that Officer Porter was "engaged in the discharge of his duties in pursuit of railroad, street railway, or transportation system business when he arrested Appellee." *Id.* at 301. The cited reasoning for this stance follows:

> According to the undisputed testimony, PAT Officer Porter was on routine patrol driving in a PAT vehicle from one PAT property to another when he observed Appellee nearly collide with his PAT vehicle. While the Act does not

define the precise duties to be executed by railway policemen, the uncontradicted suppression hearing testimony of PAT Officer Porter was that his job included patrolling PAT property, and he was required to drive from the PAT station to other PAT properties in order to achieve this goal.

*Id.* The Majority specifically concluded that the cautionary language from *Mundorf*, relied upon by Appellee, was merely dicta, and not binding upon the Court.

¶ 16 On the opposing side, Judge Johnson authored a Dissenting Opinion which agreed with the dicta from *Mundorf*. The Dissent contended that:

> [t]he phrase 'while engaged in the discharge of their duties,' critical to any consideration of this section, recognizes that an officer's discharge of specific duties consistent with the business of the Port Authority is a prerequisite to his exercise of any of the powers otherwise provided by the Act.

*Firman*, 789 A.2d at 303. The Dissent also characterized *Mundorf* as concluding that "a cognizable 'discharge of duty' should allow PAT officers to exercise their powers only 'to prevent an immediate threat to the welfare of PAT passengers or property.'" *Id.* at 304. The Dissent allowed that "[a]lthough the language the Court used in *Mundorf* is not included on the face of the Act, it recognizes inherently that the only duties subject to discharge by a Port Authority officer are those 'necessary' to the welfare of the Authority and the passengers with whose welfare the Authority is charged." *Id.*

¶ 17 The decision in *Firman* was appealed to the Pennsylvania Supreme Court, which granted allowance of appeal and ultimately affirmed this Court's *Firman* decision at *Commonwealth v. Firman*, 571 Pa. 610, 813 A.2d 643 (2002)(*Firman II* ).

Although affirming our decision, the Court did so on an alternative basis while agreeing, in principle, upon the rationale expressed by Judge Johnson in the Dissent to *Firman.* Our Supreme Court stated:

> In particular, we agree with the dissent that, by conditioning the grant of extraterritorial jurisdiction on engagement in the discharge of duties in pursuit of transportation system business, the General Assembly intended to require a closer connection between the interests of the transportation system and encounters in which police powers are to be exercised than mere "on-duty" status of transportation system police on the observation of offenses.

*Firman II,* 813 A.2d at 647.

¶ 18 In a footnote, the Court commented:

> We do not dispute the concurring opinion's position that a Port Authority policeman can fairly be considered to be acting within the scope of transportation system business while he is affirmatively in the act of traveling between duty locations. The question presented on review of the Superior Court's opinion, however, is whether this status is maintained when the officer diverts from his assigned task of traveling to the new duty location because he has observed a violation or offense potentially unrelated to transportation system business and removed from Port Authority property. Under the express provisions of the statute, the officer's general police powers simply are not implicated in such circumstances, since the extraterritorial encounter must itself be within the scope of the officer's duties in pursuit of transportation system business.

*Id.* at 648, n. 6.

¶ 19 Despite the general agreement with the position espoused by the *Firman I* Dissent, the Court ultimately concluded that the stop was legal since Firman's act of swerving and nearly hitting the vehicle of Officer Porter endangered PAT property and the safety of PAT personnel. The Court states:

> In circumstances in which a motorist's conduct on a public highway jeopardizes Port Authority personnel, property, or passengers (here, the transportation system officer and the authority vehicle that he was operating), we conclude that a sufficient connection to transportation system business arises such that extraterritorial jurisdiction of Port Authority policemen is implicated. Once police power is so enabled, absent a sufficient break in the encounter, its exercise may continue through an investigatory stop and/or arrest, where otherwise warranted.

*Id.* at 648.

¶ 20 Thus, *Firman II* must be read to overrule *Firman I* to the extent *Firman I* holds that a police officer who receives his authority under the Act is "engaged in the discharge of his duties in pursuit of railroad, street railway, or transportation system business" whenever the officer's duties take him over public roads. Instead, the exercise of extraterritorial jurisdiction rests upon a "closer connection" between the exercise of police authority and the interests of the transportation system. While the Supreme Court may not have been restricting its "closer connection between the interests of the transportation system and encounters in which police powers are to be exercised" language to the *Firman I* Dissent's "necessary to the welfare of the Authority and the passengers with whose welfare the Authority is charged" language, the language from the *Firman I* Dissent is a useful starting point for determining the sufficiency of the connection.

¶ 21 *Firman II* is notable for another relevant distinction made therein. In its Opinion, the Court recognized that the Act grants both "primary and derivative jurisdiction." The Court states:

[T]he Act plainly includes aspects of both primary or derivative jurisdiction ("Railroad and street railway policemen shall severally possess and exercise all the powers of a police officer in the City of Philadelphia, in and upon, and in the immediate and adjacent vicinity of, the property of the corporate authority"), and a distinct, direct grant of extraterritorial authority ("or elsewhere within this Commonwealth while engaged in the discharge of their duties in pursuit of railroad, street railway or transportation system business").

*Id.* at 647.

¶ 22 Under the Railroad and Street Railway Police Act, police officers empowered under the Act possess regular police powers[4] while "in and upon, and in the immediate and adjacent vicinity of, the property of the corporate authority." Alternatively, police officers approved under the Act have police powers "elsewhere within this Commonwealth while engaged in the discharge of their duties in pursuit of railroad, street railway or transportation system business." However, under *Firman II*, the exercise of this form of police authority must bear a close connection to the interests of the railroad or transportation entity. We now analyze the present case utilizing the principles set forth in *Firman II*.

¶ 23 Working backwards and considering the second form of authorized police power, it seems clear that, in light of *Firman II*, Officer Sloan did not have authority to effectuate a traffic stop of Appellant "in the discharge of [his] duties in pursuit of railroad, street railway or transportation system business." Officer Sloan indicates that while traveling on Route 11/15 near the Borough of Marysville he observed careless or erratic driving on the part of Appellant in the form of crossing over the center line, crossing over the white line to the berm of the road, driving for long distances with the brakes on, and changing speeds from slow to fast. However, Officer Sloan does not provide any indication that Appellant's driving threatened railroad property, personnel or passengers or in any way affected the operation of the railroad. As such, Officer Sloan's stop of Appellant constituted a general exercise of police power. Under the Act, Officer Sloan was empowered to exercise such police powers only "in and upon, and in the immediate and adjacent vicinity of, the property of the corporate authority," *i.e.*, Norfolk Southern property.

¶ 24 It is clear that the stop did not occur on Norfolk Southern property. Rather, it occurred on State Route 11/15. Thus, unless the place where Appellant was observed to drive in erratic fashion occurred "in the immediate and adjacent vicinity of" Norfolk Southern property, the stop of Appellant must be deemed illegal. Precisely what the term "in the immediate and adjacent vicinity of" means is unclear, as we are unaware of any cases interpreting the phrase in the context of the present statute. According to Officer Sloan's testimony, Route 11/15 was close enough to the railroad that the railroad tracks were visible from the road. We hesitate to conclude that the mere fact that the railroad tracks were visible from the road makes the roadway "in the immediate and

---

4. By the term "regular police powers" we mean the statutory phrase "all the powers of a police officer in the City of Philadelphia."

adjacent vicinity of" the railroad. After all, there are portions of interstate highways in Pennsylvania that run parallel to railroads for certain stretches which may allow visible surveillance of the railroad. If the terrain is open, such surveillance might be possible even though the highway may be a quarter-mile or more away. Under such circumstances, it would certainly strain the common sense meaning of the word, as well as the purpose of the Act, to suggest that a limited access highway was "in the immediate and adjacent vicinity of" the railroad. Even if such a highway was situated mere yards away from such a highway, the fact that the highway was limited access would seemingly argue against the prospect of concluding that the highway was "in the immediate and adjacent vicinity of" the railroad as it would be disconnected and inaccessible from the railroad's property.

¶ 25 Indeed, we hesitate to conclude that the phrase "in the immediate and adjacent vicinity of" railroad property would ever encompass a public road adjacent to railroad property given that the Act has been construed to substantially limit the extrajurisdictional exercise of police powers and, presumably, a public roadway is subject to patrol by other police specifically authorized to patrol the roadway. Nevertheless, in the present case, while the testimony establishes that Route 11/15 was near enough to the railroad to allow visual surveillance of the railroad tracks, there is no testimony indicating the actual distance from the tracks where Officer Sloan first came upon Appellant. There is also no indication of the intervening space between the roadway and the railroad tracks such as whether there were other roads in between the tracks and Route 11/15, whether there was a wall or fencing between the railroad right-of-way and Route 11/15, or whether there existed other natural or manmade barriers such as gullies or creekbeds between the railroad tracks and the roadway. Assuming that under the Act a public roadway that was merely near a railroad could be construed to be "in the immediate and adjacent vicinity of" railroad property so as to imbue its police officers with extrajurisdictional police powers, we believe that all of these factors would be relevant to that determination. In short, there is no testimony or evidence from which we may conclude that the portion of the road in question was "in the immediate and adjacent vicinity of" Norfolk Southern Railroad property so as to imbue Officer Sloan with primary jurisdiction/authority. Absent this form of authority, the stop of Appellant must be deemed illegal. Since, when challenged, the Commonwealth has the burden of demonstrating the legality of the evidence seized, Pa.R.Crim.P. 581(H), *Commonwealth v. Gordon,* 546 Pa. 65, 683 A.2d 253 (1996), we must conclude that the Commonwealth failed to carry its burden and, consequently, that the court erred in denying Appellant's motion to dismiss to the extent it sought suppression of evidence gathered as a result of the stop of Appellant.

¶ 26 Judgment of sentence vacated. Jurisdiction relinquished.