James B. SNYDER, Jr.

v.

COMMONWEALTH OF PENNSYLVA-
NIA, DEPARTMENT OF TRANS-
PORTATION, BUREAU OF DRIVER
LICENSING, Appellant.

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 16, 2010.
Decided July 28, 2010.

Terrance M. Edwards, Asst. Counsel and Harold H. Cramer, Asst. Chief Counsel, Harrisburg, for appellant.

Robert G. Del Greco, Jr., Pittsburgh, for appellee.

BEFORE: COHN JUBELIRER, Judge, and McCULLOUGH, Judge, and KELLEY, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

■ The Pennsylvania Department of Transportation, Bureau of Driver Licensing (Department), appeals from the order of the Court of Common Pleas of Allegheny County (trial court), which sustained James B. Snyder, Jr.'s (Licensee) appeal from the Department's suspension of his operating privileges. The Department suspended Licensee's operating privileges pursuant to Section 1547(b) of the Vehicle Code (Code), 75 Pa.C.S. § 1547(b), commonly referred to as the Implied Consent

Law,[1] because he refused to submit to chemical testing following his arrest for driving under the influence (DUI). The Department contends that the trial court erred as a matter of law in sustaining Licensee's appeal when it determined that the Pittsburgh Port Authority Transit (Port Authority) police officers who arrested Licensee for DUI did not have jurisdiction to do so.

On February 4, 2008, the Department notified Licensee that his operating privileges were being suspended for one year pursuant to the Implied Consent Law, effective March 10, 2008, because Licensee refused to submit to chemical testing on December 23, 2007. Licensee timely appealed, and the trial court held a de novo hearing on August 21, 2008, during which Port Authority Police Officers Hillgartner and O'Malley testified.

The undisputed testimony of Officer Hillgartner established that, at approximately 2:00 a.m. on December 23, 2007, while conducting a roving patrol of the Port Authority bus routes in the vicinity of the intersection of Wood Street and Sixth Avenue, Officers Hillgartner and O'Malley observed a vehicle driven by Licensee make an illegal left turn from Wood Street onto Liberty Avenue. Officer Hillgartner testified that, although Licensee was on a City of Pittsburgh roadway when he committed the violation, a "Port Authority [train] Station is adjacent to [the] intersec-tion [of Wood and Liberty]." (Hr'g Tr. at 12, R.R. at 22a.) Officer Hillgartner confirmed that a map introduced into evidence by Licensee depicted the location of the Wood Street train station as being adjacent to the intersection of Wood Street and Liberty Avenue. (Licensee Exhibit B, R.R. at 52a; Hr'g Tr. at 11, R.R. at 21a.) Officer Hillgartner testified that he and Officer O'Malley pursued Licensee's vehicle through the illegal left turn onto Liberty Avenue and the immediate, legal right turn onto Seventh Avenue where they initiated a traffic stop prior to the intersection of Seventh Avenue and Penn Avenue. Upon requesting Licensee's driver's license, vehicle registration information, and insurance, Officer Hillgartner noticed the smell of alcohol emanating from the vehicle. Licensee agreed to exit the vehicle and conduct a series of standardized field sobriety tests, which he failed. Licensee additionally submitted to a portable breath test, which tested positive for the presence of alcohol. After failing the field sobriety tests and the portable breath test, Officer Hillgartner placed Licensee under arrest for DUI and transported him to the Port Authority Police Station (police station) for processing.

Officer O'Malley testified that, after arriving at the police station, he read verbatim the DL–26 Form (form) chemical testing warning to Licensee.[2] Licensee

---

1. The Implied Consent Law authorizes the suspension of a licensee's operating privileges where the licensee is placed under arrest for driving under the influence (DUI) and the licensee refuses to submit to chemical testing at the request of a police officer. 75 Pa.C.S. § 1547(b)(1)(i). In order to sustain suspended driving privileges under Section 1547(b) of the Vehicle Code, the Department must prove that the licensee: (1) was placed under arrest for DUI; (2) was asked to submit to chemical testing; (3) refused such testing; and (4) was "warned that a refusal would result in the suspension of his operating privileges."

*Weems v. Department of Transportation, Bureau of Driver Licensing,* 990 A.2d 1208, 1211 (Pa.Cmwlth.2010).

2. Form DL–26 outlines the consequences of refusing to submit to a chemical test of an individual's blood alcohol level following an arrest for DUI. It warns the individual that refusal will result in the suspension of his or her operating privileges for at least 12 months. *Stancavage v. Department of Transportation, Bureau of Driver Licensing,* 986 A.2d 895, 897 n. 3 (Pa.Cmwlth.2009).

repeated multiple times that he did not understand the form and, after reading the form to Licensee again, Officer O'Malley asked specifically what part of the form Licensee did not understand. Licensee did not specifically answer Officer O'Malley's question, but kept repeating "I don't understand." (Hr'g Tr. at 21, R.R. at 31a.) Licensee did not sign the form and refused to submit to a chemical test. The Department subsequently suspended Licensee's operating privileges for a period of twelve months with an effective date of March 10, 2008.[3]

After considering the testimony and evidence presented at the hearing, the trial court held that Officers Hillgartner and O'Malley did not have jurisdiction to stop and arrest Licensee, thereby making the Officers' invocation of the Implied Consent Law invalid. The Department now appeals to this Court, raising only one issue.[4] The Department contends that the trial court erred as a matter of law because Officers Hillgartner and O'Malley had the statutory authority to conduct the traffic stop and, subsequently, arrest Licensee for DUI. We agree.

Section 3303(a) of the Railroad and Street Railway Police Act (Act), 22 Pa.C.S. § 3303(a), addresses the jurisdiction that Port Authority police officers have in exercising general police powers and provides as follows:

Railroad and street railway policeman shall severally possess and exercise all the powers of a police officer in the city of Philadelphia, in and upon, and in the immediate and adjacent vicinity of, the property of the corporate authority or elsewhere within this Commonwealth while engaged in the discharge of their duties in pursuit of railroad, street railway or transportation system business.

22 Pa.C.S. § 3303(a).[5] This section of the Act has been interpreted to provide Port Authority police with two different types of jurisdiction to exercise police powers: (1) primary jurisdiction; and (2) extraterritorial jurisdiction. *Commonwealth v. Firman,* 571 Pa. 610, 616, 813 A.2d 643, 647 (2002). Primary jurisdiction is the "authority [of the Port Authority police] ... constrained by the geographical area corresponding with its territorial limits" to exercise regular police powers "in and upon, and in the immediate and adjacent vicinity of the property or corporate authority." *Firman,* 571 Pa. at 616–17, 813 A.2d at 647. In contrast, a Port Authority police officer has extra-territorial jurisdiction to make stops and arrests if, while on-duty and engaged in official transportation business, he observes someone making a threat to Port Authority property, passengers, or personnel. *Id.* at 617–18, 813 A.2d at 647–48.

When determining whether Port Authority officers had the requisite primary jurisdiction necessary to exercise police

3. Licensee's certified driving record indicates that a previous ARD–DUI violation under 75 Pa.C.S. § 3802(c) (Highest Rate of Alcohol) resulted in an ARD disposition and a 60 day suspension of his operating privileges. Licensee's operating privileges were restored by the Department on November 25, 2007. (Certified Driving Record at 2, R.R. at 48a.)

4. "This Court's scope of review is limited to determining whether necessary findings of fact are supported by competent, record evidence, whether the trial court committed an error of law, or abused its discretion in reaching its decision." *Ryan v. Department of Transportation, Bureau of Driver Licensing,* 823 A.2d 1101, 1103 n. 2 (Pa.Cmwlth.2003).

5. The Act requires Port Authority officers to "undergo the same intensive training as municipal officers. *See* 22 Pa.C.S. § 3303(d)." *Commonwealth v. Firman,* 571 Pa. 610, 617, 813 A.2d 643, 647 n. 5 (2002).

power, courts look closely to the geographic relationship between the Port Authority property and the location where the violation occurred. In *Commonwealth v. Bloom,* 979 A.2d 368 (Pa.Super.2009), the Superior Court held that a Port Authority police officer had primary jurisdiction to stop a defendant that committed a traffic violation. In *Bloom,* the defendant, while travelling on a state road, drove through a red light that was activated by a Port Authority-owned signaling system and located 500 feet from a Port Authority-owned and operated tunnel. A Port Authority officer patrolling the tunnel observed the defendant's violation, pulled him over on the state road approximately 75 feet from the traffic light and 150 feet from the tunnel, and subsequently arrested him for DUI. *Bloom,* 979 A.2d at 372. Because the traffic violation occurred within the immediate and adjacent vicinity of Port Authority property, the Superior Court concluded that the Port Authority officer had primary jurisdiction to stop and arrest the defendant. *Id.*

In contrast, in *Commonwealth v. Quaid,* 871 A.2d 246 (Pa.Super.2005), the Superior Court held that a railroad officer did not have primary jurisdiction when he stopped the defendant for driving erratically on a state route because the testimony and evidence did not establish the requisite geographical proximity. Specifically, the officer in *Quaid* provided no testimony or evidence that the violation occurred "in the immediate and adjacent vicinity" of the railroad company's property to support the conclusion that the stop fell within the officer's primary jurisdiction. *Quaid,* 871 A.2d at 253. The officer testified only that the railroad was visible from the roadway. The officer did not provide any testimony as to the distance from the tracks to where the officer observed the defendant committing the violation, nor did the Commonwealth present any evidence regarding the

presence of intervening obstacles or obstructions. The Superior Court held that mere observation of the railroad property from the roadway was not sufficient to impart primary jurisdiction upon the railroad officer and that testimony or evidence is required to show that the defendant's traffic violation occurred in the "immediate and adjacent vicinity" of the railroad property. *Id.* at 254.

In the present case, the trial court dismissed the Department's position that Officers Hillgartner and O'Malley exercised primary jurisdiction when arresting Licensee by stating in a single sentence that "[Licensee] was not on [Port Authority] property when he committed the violation, nor was he on an immediate and adjacent area, although someone on [Port Authority] property could observe him." (Trial Court Op. at 3, R.R. at 77a.) However, the undisputed testimony of Officer Hillgartner and the image depicted by the map that Licensee submitted into evidence contradict the trial court's conclusion.

Officers Hillgartner and O'Malley stopped Licensee in response to the traffic violation he committed at an intersection on a city roadway that was "adjacent" to the Wood Street train station. (Hr'g Tr. at 12, R.R. at 22a.) While the General Assembly did not expressly define "immediate and adjacent" with regard to the application of the terms in Section 3303 of the Act, the Rules of Statutory Construction provide that "words and phrases shall be construed according to rules of grammar and according to their common and approved usage." Section 1903(a) of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1903(a). The term "immediate" is commonly defined as "not far apart or distant." Webster's Third New International Dictionary 1129 (2002). Additionally, the term "adjacent" is commonly defined as "not distant or far off; nearby but

not touching." *Id.* at 26. The facts in the present case are undisputed. Officer Hillgartner testified that the Port Authority operates a train station adjacent to the intersection of Wood Street and Liberty Avenue, which is the location where Licensee made the illegal left turn that resulted in the traffic stop. (Hr'g Tr. at 12, R.R. at 22a.) Additionally, the map provided by Licensee, and confirmed by the undisputed testimony of Officer Hillgartner, shows that Wood Street, Liberty Avenue, and Sixth Avenue form a triangle, in the center of which the Wood Street train station is located. (Licensee Exhibit B, R.R. at 52a; Hr'g Tr. at 10–11, R.R. at 20a–21a.) Further, there is nothing in the record to indicate that there are any obstructions or obstacles between the Wood Street train station and the intersection of Wood Street and Liberty Avenue that would preclude them from being considered immediate and adjacent to each other. (Licensee Exhibit B, R.R. at 52a; Hr'g Tr. at 11, R.R. at 21a.) Additionally, Officer Hillgartner's testimony that the map was accurate in that it indicated the precise location of the traffic violation by Licensee was undisputed. (Hr'g Tr. at 11, R.R. at 21a.)

The facts here are similar to those in *Bloom.* Like the defendant in *Bloom,* Licensee committed a traffic violation on a city-owned roadway that was adjacent to Port Authority property, i.e., the Wood Street train station, and with no apparent intervening obstacles or obstructions. Because the undisputed evidence indicates that the location where Licensee committed the traffic violation was in the immediate and adjacent vicinity of Port Authority property, Officers Hillgartner and O'Malley had primary jurisdiction to stop Licensee for that violation and, therefore, the traffic stop was legal. *Bloom,* 979 A.2d at 372. Moreover, unlike the officer in *Quaid,* Officer Hillgartner's testimony, as well as the map provided by Licensee, indicates that the intersection at issue here was not merely visible from the Port Authority property, but was actually in the immediate and adjacent vicinity as the statute requires for a Port Authority officer to have primary jurisdiction.

Licensee argues that this Court should not conclude that Officers Hillgartner and O'Malley had primary jurisdiction on these facts because to do so would place every city-owned roadway adjacent to the Port Authority train station, as well as property "near every bus route, stop, shelter, or underground subway station," within the primary jurisdiction of Port Authority officers. (Licensee's Br. at 11.) In doing so, Licensee claims the effect would be "granting Port Authority police general police powers to conduct traffic stops and make arrests throughout the City of Pittsburgh." (Licensee's Br. at 11.) However, Licensee's argument fails to recognize the limits Section 3303 of the Act places on Port Authority police when exercising general police powers as well as the case law that has interpreted this section.

The General Assembly has *limited* the jurisdiction of Port Authority police officers to protecting passengers, personnel, and actual property of the Port Authority when Port Authority officers are in the pursuit of official business, as well as protecting the general public when those persons violating the law are doing so within the immediate and adjacent vicinity of Port Authority property. However, the Act does not exclude "city-owned roadways" from the jurisdiction of Port Authority police officers. Had the General Assembly intended to exclude city-owned roadways from the officers' jurisdiction, they could have done so. Thus, although the jurisdiction of Port Authority police officers may extend to stops and arrests on city-owned property, *see Firman,* 571 Pa. at 618, 813 A.2d at 648 (holding that Port

Authority police had jurisdiction to stop and subsequently arrest the defendant for DUI on a public highway), in addition to Port Authority-owned property, those stops and arrests made by Port Authority police officers must, nonetheless, be confined to the statutorily defined limitations. As a result, we are not persuaded by Licensee's argument.

Because the undisputed evidence establishes that the Licensee committed the traffic violation in the immediate and adjacent vicinity of the Port Authority-owned and operated Wood Street train station, Officers Hillgartner and O'Malley had the requisite jurisdiction to effectuate the traffic stop of Licensee. Accordingly, we reverse the order of the trial court.[6]

### ORDER

**NOW,** July 28, 2010, the order of the Court of Common Pleas of Allegheny County in the above-captioned matter is hereby **REVERSED** and James B. Snyder, Jr.'s driving privilege suspension is **REINSTATED.**

DISSENTING OPINION BY Senior Judge KELLEY.

I respectfully dissent. I believe the Majority's reversal of the trial court's order sustaining James B. Snyder, Jr.'s (Licensee) appeal from the suspension of his operating privilege by the Commonwealth of Pennsylvania, Department of Transportation, Bureau of Driver Licensing (DOT), on the basis of primary jurisdiction is erroneous. The Majority concludes that the Port Authority of Allegheny County (Port Authority) Police Officers had the requisite primary jurisdiction pursuant to Section 3303(a) of the Railroad and Street Railway

Police Act (Act), 22 Pa.C.S. § 3303(a), to effectuate a traffic stop of Licensee after observing Licensee make an illegal left turn onto a city-owned street. Section 3303(a) provides as follows:

Railroad and street railway policeman shall severally possess and exercise all the powers of a police officer in the city of Philadelphia, in and upon, and in the immediate and adjacent vicinity of, the property of the corporate authority or elsewhere within this Commonwealth while engaged in the discharge of their duties in pursuit of railroad, street railway or transportation system business.

22 Pa.C.S. § 3303(a). As pointed out by the Majority, Section 3303(a) has been interpreted to provide Port Authority police with two different types of jurisdiction to exercise police powers: (1) primary jurisdiction; and (2) extra-territorial jurisdiction. *Commonwealth v. Firman,* 571 Pa. 610, 617, 813 A.2d 643, 647 (2002). Our Supreme Court in *Firman* described the concept of primary jurisdiction as "authority .... *constrained by the geographical area corresponding with its territorial limits." Id.* at 616, 813 A.2d at 647 (emphasis added).

Herein, the Majority determined, based on the undisputed evidence, that the Port Authority Police Officers had the requisite primary jurisdiction because the traffic violation which occurred on a city-owned roadway, Liberty Avenue, was adjacent to Port Authority property, the Wood Street train station, with no apparent intervening obstacles or obstructions between Liberty Avenue and the Wood Street station. Accordingly, the Majority, believing the traffic violation was committed in the immediate and adjacent vicinity of Port Authority property, holds that the Port Authority

---

6. Because this Court has concluded that primary jurisdiction existed, we do not reach the issue of whether Officers Hillgartner and

O'Malley had extra-territorial jurisdiction to arrest Licensee.

Police Officers had primary jurisdiction to stop Licensee for that violation and, therefore, the traffic stop was legal.[1] I disagree that the Port Authority Police Officers had primary jurisdiction.

As correctly noted by the Majority, the General Assembly did not define the clause "in the immediate and adjacent vicinity" and our Supreme Court has not addressed or specifically interpreted the clause "in the immediate and adjacent vicinity of, the property of the corporate authority" as set forth in Section 3303(a) of the Act. The Majority looks to the dictionary definitions of "immediate" and "adjacent" and states that the term "immediate" is commonly defined as "not far apart or distant" and the term "adjacent" is commonly defined as "not distant or far off; nearby but not touching." Webster's Third New International Dictionary 26; 1129 (2002). The Majority relies upon the Superior Court's decision in *Commonwealth v. Bloom*, 979 A.2d 368 (Pa.Super.2009), as support for the holding that the Port Authority Police Officers in this matter had primary jurisdiction to effectuate a legal traffic stop of Licensee. However, I believe that the facts of *Bloom* actually support a determination herein that the Port Authority Police Officers did not have primary jurisdiction.

In *Bloom*, the Superior Court determined that the Port Authority Police Officer did have primary jurisdiction to effectuate a traffic stop because the traffic violation occurred in the "immediate and adjacent vicinity" of Port Authority Property. The uncontradicted testimony of the arresting officer established that:

(1) he was patrolling the Wabash Tunnel which is Port Authority property; (2) the Wabash Tunnel ramp intersects with Woodruff Street which is a municipal street; (3) the traffic light on Woodruff Street is triggered by a Port Authority-owned signaling system, located approximately 500 feet from the tunnel, which is activated by cars exiting the Wabash Tunnel; (4) Appellee was traveling on Woodruff Street and failed to stop at the red traffic light; (5) Appellee nearly collided with two vehicles that had just proceeded from the Wabash Tunnel ramp; (6) the officer pursued Appellee's vehicle and stopped him approximately 150 feet from Port Authority property, and 75 feet from the traffic light. (N.T., 7/29/08, at 5–21).

*Bloom*, 979 A.2d at 372. The Superior Court concluded that "[t]his evidence [was] sufficient to show that Appellee committed the violation and was stopped in the "immediate and adjacent vicinity" of Port Authority property." *Id.*

I believe that the evidence in the present matter is clearly insufficient, as compared to *Bloom*, to support a determination that the traffic violation was committed in the "immediate and adjacent vicinity" of Port Authority property. First, the Port Authority Police Officers testified that they were conducting a roving patrol of the Port Authority bus routes in the vicinity of the intersection of Wood Street and Sixth Avenue. Therefore, the Police Officers were not patrolling Port Authority property as in *Bloom* but were patrolling city-owned roadways upon which the Port Authority buses travel. Second, the uncontradicted testimony in *Bloom* shows that the motorist ran a red traffic light which was triggered by a Port Authority-owned signaling system, located approximately 500 feet from the Port Authority owned Wabash Tunnel, which is activated by cars

---

1. I note that Licensee was actually stopped by the Port Authority Police Officers near the intersection of Seventh Avenue and Penn Avenue.

exiting the Wabash Tunnel. Herein, Licensee made an illegal left turn from a city-owned street, Wood Street, onto another city-owned street, Liberty Avenue, which is not controlled by a Port Authority owned signaling system nor do cars enter either Wood Street or Liberty Avenue from Port Authority owned property.

More importantly, however, there is no evidence of record in this matter that shows where the corporate jurisdictional line of the Port Authority begins or ends to definitively mark the application of the "immediate and adjacent vicinity" of Port Authority property. The Majority concludes that the map entered into evidence and relied upon by the Port Authority Police Officers is sufficient to show that the traffic violation occurred in the immediate and adjacent vicinity of Port Authority property. I note that the map entered into evidence is a Google map of the area, not an official map of the City of Pittsburgh. As such, the Google map does not set forth the distance between the Wood Street train station and the site on Liberty Avenue where Licensee made the illegal left turn.[2] Ignoring this fact, the Majority believes that because the Port Authority Police Officer indicated that the map depicted the general area and because there are no obstructions or obstacles between the Wood Street train station and the intersection of Wood Street and Liberty Avenue, there is nothing to preclude them from being considered immediate and adjacent to each other.

However, such reasoning begs the question. How close to Port Authority property must a traffic violation occur in order to be within the "immediate and adjacent vicinity" of Port Authority property? The dictionary definitions cited by the Majority clearly do not answer this question. As stated previously herein, our Supreme Court in *Firman* described the concept of primary jurisdiction as *constrained by the geographical area corresponding with its territorial limits*. The geographical area of the Wood Street train station is the actual parcel of property housing the building and the territorial limits of the Wood Street train station is the exterior of the building housing the train station. Liberty Avenue is clearly not part of the geographical area or within the territorial limits of Port Authority property. In *Bloom*, the evidence showed that it was much clearer that the traffic violation occurred in the immediate and adjacent vicinity of Port Authority property or, in other words, the violation occurred within the geographical area corresponding with the Port Authority's territorial limits. I do not believe the same conclusion can be drawn from the evidence presented in this case.

Accordingly, I would affirm.

---

**2.** The Notes of Testimony reveal that Licensee's attorney entered "a Google map of the area" into evidence at Exhibit B. *See* Reproduced Record at 20a–21 a; 52a.