J-A24018-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NICHOLAS ALEXANDER FORMAN | : | |
| | : | |
| Appellant | : | No. 2476 EDA 2021 |

Appeal from the Judgment of Sentence Entered August 19, 2021
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s):  CP-46-CR-0002241-2020

BEFORE:  PANELLA, P.J., BENDER, P.J.E., and SULLIVAN, J.

MEMORANDUM BY PANELLA, P.J.:              **FILED JANUARY 4, 2023**

Nicholas Alexander Forman appeals from the judgment of sentence entered in the Montgomery County Court of Common Pleas on August 19, 2021, following his conviction for first-degree murder. After careful review, we affirm.

Forman's convictions stem from the beating and strangulation death of his girlfriend after a night out watching the Super Bowl on February 2, 2020. Forman was subsequently charged with first and third degree murder. Both charges were held for court after a preliminary hearing. In April 2021, Forman filed pretrial motions to suppress evidence which were denied.

A four-day jury trial was held between August 16, 2021 and August 19, 2021. The trial court summarized the extensive trial testimony as follows:

On February 3, 2020, at approximately 11:10 a.m., [Forman] arrived at the emergency department of Pottstown Hospital in an

Uber with the victim, []. (N.T., Trial by Jury - Day 1, 8/ 16/21, pp 61 - 62). Marques Harmon, a security officer at the hospital, went outside to assist, and there he saw that the victim in the backseat of the vehicle was unresponsive and had multiple injuries. *Id*. at 62 - 64. Mr. Harmon went immediately to get additional assistance. *Id*. at 65. Several nurses came to help and began to administer CPR. *Id*. at 66. The victim was taken by gurney inside for further treatment. *Id*.

[Forman] stayed at the hospital, and upon Mr. Harmon's suggestion, [Forman] followed him into a conference room, a room for families of a critically injured patient. *Id*. at 69 - 70. Once there, [Forman] offered an explanation for the victim's condition. *Id*. at 71. [Forman] told Mr. Harmon that the victim had been in a physical fight with several females that she had a verbal altercation with earlier that night, when they had been at P.J. Whelihan's celebrating the Super Bowl. *Id*. at 71 - 73.

Breanna Coyle, an emergency room nurse at Pottstown Hospital, responded to Mr. Harmon's call for assistance. *Id*. at 84, 86. She described the victim as lifeless, without a pulse. *Id*. at 87. She observed [] the victim's condition as disheveled, with bruising on her face and around her neck, and her clothes were covered with debris. *Id*. at 87 - 88. When she started CPR, she noticed the victim's body was very cold. *Id*. at 88. Once back in the emergency room, Nurse Coyle saw bruising on the victim's extremities, scratches and bruising on her arms, dried blood and vomit on her face, swelling to her jaw, and bruising and swelling about the neck. *Id*. at 90 - 97. Nurse Coyle described the steps the emergency room personnel took in an attempt to resuscitate the victim. The nurse never saw any signs of life, no pulse, no respiration, and no consciousness. *Id*. at 98 - 99.

Jolene Gaus, an emergency room nurse at Pottstown Hospital assisted Nurse Coyle with CPR. *Id*. at 102. She also observed that the victim's condition was lifeless and cold upon her arrival to the hospital. *Id*. at 103. There was no pulse or respiration, she was very cold, her lips were blue, and presented with multiple bruising and facial injury trauma. *Id*. at 104.

Julie Rich, a nurse practitioner at Pottstown Hospital, also ran outside to assist both nurses Coyle and Gaus. *Id*. at 121. In the emergency room, advanced forms of life support were provided to the victim, but they were unable to get the victim's heart beating

or the victim breathing on her own. *Id*. at 124. She testified that the victim presented as disheveled and with evidence of trauma about her neck and face. *Id*. at 123, 124 - 125. In particular, there were circumferential marks around her neck. *Id*. at 125. Nurse Rich notified the police that this might potentially be a crime. *Id*. at 126.

Nurse Coyle, Nurse Gaus, and Diane Marie Craig, an emergency room technician, all of whom observed [Forman]'s demeanor, described him as calm during the initial resuscitation efforts. *Id*. at 99, 106 - 107, 114. Nurse Rich described [Forman]'s affect as flat, devoid of emotion. *Id*. at 128.

Dr. Jeremy Zwillenberg, an emergency room doctor at Pottstown Hospital, treated the victim back in the trauma bay. *Id*. at 135. He described the life resuscitating efforts they employed but despite these efforts they were unable to rewarm the victim or restart her heart. *Id*. at 136 - 139.

Detective Heather Long, a Pottstown Police Department detective, responded to the hospital for an unresponsive female. *Id*. at 150 -151. She responded with a fellow officer, Sergeant Thomas Leahan. *Id*. at 151. After initially reviewing hospital surveillance video, she went into the conference room where [Forman] was waiting. *Id*. at 154. She asked [Forman] for his consent to search his cell phone and provided a consent to search form to him, which she explained. *Id*. [Forman] consented, he signed the form, and provided the detective with the passcode. *Id*.

Detective Long, knowing that [Forman] arrived to the hospital in an Uber, went to the Uber application on his phone and found his previous trip history. *Id*. at 156. She also reviewed the videos and photographs on his cell phone, and she found a photograph of the victim lying face down on a floor, with her clothes disheveled. *Id*. at 156 - 157. There was also a video of [Forman], taken several hours later. *Id*. at 157. The following morning there was a photograph of the victim seat-belted in the back of the Uber. *Id*. The cell phone was later turned over to the Pennsylvania State Police to download it forensically. *Id*. at 161.

Detective Sergeant Thomas Leahan learned that the victim's boyfriend was in the consultation room with another officer, Officer Nikolaus Stoltzfus. *Id*. Detective Leahan proceeded to the consultation room to speak with [Forman]. *Id*. [Forman] told him

- 3 -

that he and the victim had gone to P.J. Whelihan's for the Super Bowl, where she got into an altercation with three females. *Id*. at 165. He further told the sergeant that the victim gave the females his address so they could meet up at his house to fight, and that she did in fact fight with them. *Id*. at 165 - 166. [Forman] stated that after they fought, he carried the victim into his apartment and that he fell asleep at 6:00 a.m. *Id*. at 166. When he woke up at 9:45 a.m. he realized that she was having trouble breathing and called for an Uber to take them to the hospital. *Id*. at 166. [Forman] never asked about the victim's condition. *Id*. at 167. His demeanor was calm, cool, and collected. *Id*.

Officer Nikolaus Stoltzfus, an officer with the Pottstown Police Department, also responded to Pottstown Hospital for a call of a suspicious person, that a person was brought to the hospital already deceased, and to investigate. (N.T, Trial by Jury- Day 2, 8/17/21, p. 9 - 10). Officer Stoltzfus made contact with [Forman] in the conference room. *Id*. at 12. He asked [Forman] what had brought him to the hospital that day. *Id*. at 12 - 13. [Forman] stated that he had been at P.J. Whelihan's to watch the Super Bowl the night before. *Id*. at 13. While there, the victim got into an altercation with three females. *Id*. [Forman] also told the officer that the victim remained in contact with these women, and when they arrived at his house, the females arrived there and wanted to fight her. *Id*. [Forman] stated that when they fought, he went inside. *Id*. Sometime later, [Forman] went back outside and he found the victim laying on the ground. *Id*. at 13 - 14. He helped victim into his house and put her to bed. *Id*. at 14. [Forman] said that he woke up at 6:30 a.m., and that she was breathing. At around 9:45 he realized that there was something wrong with her and that is when he called an Uber to go to the hospital. *Id*. [Forman]'s demeanor was calm while speaking with the officer. *Id*. [Forman] never asked about the victim's condition. *Id*.

Next the Commonwealth called several employees from P.J. Whelihan's who worked on the night of the Super Bowl, February 2, 2020. In particular, Ashley LePerson, a server at P.J. Whelihan's, testified that [Forman] and the victim sat down for food and drinks at about 6:30 p.m. *Id*. at 18, 19, 20 - 21, 23, 25. She testified that their behavior seemed normal, and that she did not observe anyone talking to the victim. *Id*. at 27. This testimony was echoed by Anthony Dadario, a bartender at P.J. Whelihan's, that their behavior was normal and that no one came up to them.

*Id*. at 37. Further, Ciara Kehoe, another bartender, noted that [Forman] and the victim closed out their tab at 10:03 p.m., and that she did not see anyone approach them that night. *Id*. at 46. Finally, Maxine Dobson, the general manager at P.J. Whelihan's testified. *Id*. at 49. She reviewed the surveillance footage from the cameras. *Id*. at 51. She found nothing of significance. *Id*. And when she spoke to her staff, nobody told her that there was any sort of altercation. *Id*. at 52.

Daniel Persing, an Uber driver, drove [Forman] and the victim home from P.J. Whelihan's. *Id*. at 59 - 60, 61. Right before a pit stop to Quick Mart, Mr. Persing remembered that the victim received a text message, and [Forman] asked her about it. *Id*. at 63. The victim tried to dismiss his question, but [Forman] continued to ask about the text message about three or four times prior to Quick Mart. *Id*. at 63 - 64. [Forman]'s demeanor was very calm, but persistent. *Id*. at 64. After the Quick Mart, [Forman] continued to ask the victim about the text message. *Id*. at 65. At some point [Forman] said, ["]I don't know if I want you to come F'ing home with me,["] and the victim responded, ["]Cut it out, you're scaring me.["] *Id*. at 66. Mr. Persing testified that he had a gut feeling that [Forman] wasn't going to let the conversation go, and after [Forman] and the victim exited the vehicle, he pulled over, put down the window and listened to see if things would calm down. *Id*. at 68 - 69, 71. For about five minutes he heard yelling and arms flailing, and then things calmed down. *Id*. at 72. Once it was quiet, Mr. Persing assumed they worked it out and left the area. *Id*. at 73 - 74.

A neighbor of [Forman], Brady Reese, testified. On February 2, 2020, he arrived home around 11:00 p.m. *Id*. at 84 - 85. He originally heard loud talking coming from across the street. *Id*. at 85. He saw a woman on the lawn. She seemed to be walking around stumbling and mumbling to herself. *Id*. at 86, 91. Mr. Reese thought she heard the woman say, ["]Help.["] *Id*. at 86. When he got halfway towards her, he asked the male that was with her if everything was alright, and he said, ["]She's fine["] and ["]she's just drunk, everything's okay.["] *Id*. It also appeared to him that the woman gave a thumbs up signal, so Mr. Reese walked back home. *Id*. He did see the couple walking side by side down the street. *Id*. at 88.

At around 2:30 a.m., in the early morning hours of February 3, 2020, Morgan Young, [Forman]'s on-and-off girlfriend, arrived at

[Forman]'s house. *Id*. at 97, 98 - 99. When she got there she texted him, and he came out to her car. *Id*. at 99 - 100. They sat in the backseat for about an hour. *Id*. at 100, 101. Ms. Young testified that [Forman]'s demeanor was calm and that he seemed his normal self. *Id*. at 102. Ms. Young further testified that she knew [Forman] and the victim were in a relationship and that the victim was inside his house. *Id*. at 102 - 103. [Forman] had told her that the victim fell in the middle of the street, he tucked her in bed, that she was unconscious but still breathing. *Id*. at 103.

Later in the day, [Forman] called an Uber and was driven to the district court in Limerick. *Id*. at 117 - 120. At the district Court was Corporal Scott Reynolds of the Upper Providence Township Police Department, who was working there that day. *Id*. at 122 - 123, 125. Corporal Reynolds testified that he interacted with [Forman] for about 15 minutes, and that his demeanor was pleasant and courteous. *Id*. at 128. [Forman] went by Uber back to his residence. *Id*. at 133 - 135.

At about 11:15 a.m. on February 3, 2020, another Uber driver [] drove [Forman] and the victim to the hospital. *Id*. at 141 - 142, 145, 151.

On February 3, 2020, Trooper Matthew Taubenberger of the Pennsylvania State Police - Criminal Investigative Unit was called to assist with the investigation. *Id*. at 167. At about 2:00 p.m., he went to [Forman]'s residence where he observed a clump of hair in the middle of the roadway immediately outside. *Id*. at 167 - 168. He photographed it and collected the hair. *Id*. at 168. Later that day, the trooper also photographed [Forman]'s injury to his right hand. *Id*. at 174 - 175.

Sergeant Thomas Falcon, the supervisor of the Criminal Investigative Unit of the Pennsylvania State Police, was also involved in the investigation. *Id*. at 179 - 180. On February 3, 2020, Sergeant Falcon along with Trooper Sanzick, the lead investigator, responded to the Pottstown Hospital[] emergency department. *Id*. at 180. There he met with Detective Wittenberger and detectives Long and Leahan. *Id*. He was provided with two cell phones and the victim's clothing, which he secured and took back to the Skippack barracks. *Id*. at 181.

The following day, on February 4, 2020, Sergeant Falcon was working with Sergeant Ryan Burza, and together they returned to

the area of 937 Hamilton Road in Collegeville to do a neighborhood canvas. *Id*. at 184. In front of [Forman]'s residence, on the front lawn, the sergeant noticed that the lawn was torn up, and that there were mud and chunks of grass leading toward the driveway at 937 Hamilton, up and over the driveway. *Id*. at 188. He also found a bracelet, a beaded bracelet, spelling out the [victim's first name]. *Id*. at 189.

Trooper Todd Wright of the Pennsylvania State Police - Forensics Unit, testified. *Id*. at 191. As a part of the investigation on February 3, 2020, he went to 937 Hamilton Road and after a search warrant was secured, he executed a search of the premises. *Id*. at 194, 195. He found a clump of hair between the storm door and entrance door. *Id*. at 197.

A full raw data extraction was performed by Nicholas Devine of the Montgomery County District Attorney's Office - Special Services Unit. *Id*. at 234 - 235. The raw data was converted into readable format. *Id*. at 239. Trooper Brad Furlong of the Pennsylvania State Police - Criminal Investigation Unit testified that he reviewed 500 videos and images from [Forman]'s phone. *Id*. at 256. In one of the videos, it depicts [the victim] taken outdoors, she's on the ground. *Id*. at 261. The date that video was created was February 2, 2020 at 11:58 p.m.

Erica Williams, M.D, a forensic pathologist for the Montgomery County Coroner's Office, was accepted as an expert in forensic pathology. (N.T., Trial by Jury- Day 3, 8/ 18/21, pp. 130 -131, 134). Dr. Williams performed an autopsy on the victim's body on February 4, 2020. *Id*. at 137. The doctor's external examination showed evidence that the victim had been strangled and beaten. *Id*. at 139 - 142. There was a constellation of injuries indicating strangulation. *Id*. at 142. There was also evidence of other blunt force trauma to the face and head, which the doctor detailed at trial. *Id*. at 143, 144 - 145. Dr. Williams removed the brain and prepared it for review by the neuropathologist, Dr. Emery. *Id*. at 145, 146.

Lyndsey A. Emery, M.D., the current assistant medical examiner for the City of Philadelphia, does private consultation work for Montgomery County. (N.T., Trial by Jury- Day 4, 8/ 19/21, p. 7). She was accepted as an expert in neuropathology. *Id*. at 11. She was brought into this case to specifically examine the victim's brain. *Id*. at 12 - 13. Dr. Emery testified that the victim's brain

- 7 -

weight was above average, which is an indicator of edema, swelling. *Id*. at 16. Her external examination of the brain revealed that it was swollen, the wrinkles in the brain look flatter. *Id*. at 23. In addition, she testified that there was bleeding into the subarachnoid space, the space between the actual brain and the covering that lays right on top of the brain. *Id*. There was hemorrhaging into that space on both sides of the brain, the cerebral hemispheres. *Id*. Next, Dr. Emery did a dissection of the brain. *Id*. at 24. After that dissection, she noted there were contusions of the brain of both cerebral hemispheres. *Id*. The victim also had hemorrhaging into a part of her brain called the pons, part of the brain stem. *Id*. at 25. Dr. Emery explained that that particular hemorrhage is called a Duret hemorrhage, and is frequently seen in blunt trauma. *Id*. The bilateral contusions on her brain suggest that there was some sort of blunt impact trauma or blunt impact injury. *Id*. at 25 - 26. She determined that based upon the distribution of injuries, there were multiple bilateral impact sites. *Id*. at 26. As far as the pons hemorrhages, the doctor has seen them very frequently in brains that have been injured by blunt trauma. *Id*. at 26 - 27.

The brain also showed evidence of a left uncal herniation, which is a space that a swollen brain can herniate through when the brain is sufficiently swollen. *Id*. at 28 - 29. Dr. Emery opined that once you are at that state of herniation, it's very difficult to survive, and that this injury is almost entirely lethal. *Id*. at 29. She explained that the herniation is a consequence of those blunt injuries. *Id*. at 29 - 30. The blunt injury happens, there's hemorrhage in the subarachnoid space, there are bruises of the brain which results in brain swelling, and that brain swelling is what causes the herniation. *Id*. at 30. In sum, the doctor found bilateral subarachnoid hemorrhages, bilateral contusions, direct-type hemorrhages of the pons, and ultimately impending left uncal herniation. *Id*. Finally, based on the hypoxic ischemic changes that the doctor saw microscopically, she was able to determine that the survival interval for the victim was less than 12 hours. *Id*. at 32 - 33.

Trial Court Opinion, 1/31/2022, at 2-12.

At the conclusion of the trial, the jury found Forman guilty of first-degree murder. The trial court sentenced Forman the same day to a term of life

imprisonment. Forman filed a timely post-sentence motion which was denied.[1]

This timely appeal followed.

Forman raises the following three issues on appeal:

1. Whether the trial court erred in denying [Forman]'s motion to suppress the contents of his cell phone where he was illegally detained when he gave consent to search it, which was not voluntary, and the scope of the search exceeded that to which he consented?

…

2. Whether the trial court abused its discretion by denying [Forman]'s motion for a mistrial after the victim's family, in the presence of the jury, had a prejudicial emotional reaction to a key piece of evidence, which deprived [Forman] of a fair trial?

…

3. Whether there was sufficient evidence presented at [] trial to sustain the guilty verdict for first degree murder where [Forman] acted with malice but without the specific intent to kill the victim?

Appellant's Brief, at 7-8.[2]

In his first issue, Forman challenges the denial of his motion to suppress

evidence gained from the search of his cell phone.

_____

[1] The order denying the post-sentence motion was dated August 30, 2021, and indicates it was sent to all parties on that date. However, for reasons that are unclear from the record, the order was not docketed as filed until November 9, 2021.

[2] Forman had raised an additional issue in his amended 1925(b) concise statement relating to the failure to instruct the jury on a charge of voluntary manslaughter. **See** Petition to Amend Appellant's Pa.R.A.P. 1925(b) Statement, 12/22/2021, at 2. While this issue was addressed by the trial court in its opinion, Forman specifically abandoned this issue on appeal. **See** Appellant's Brief, at 7, FN 1. Therefore, we will not address it.

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing the ruling of the suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Eichinger*, 915 A.2d 1122, 1134 (Pa. 2007) (citations omitted). "In appeals from suppression orders, our scope of review is limited to the evidence presented at the suppression hearing." *Commonwealth v. Caple*, 121 A.3d 511, 517 (Pa. Super. 2015) (citation omitted).

"It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony. The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing." *Commonwealth v. Elmobdy*, 823 A.2d 180, 183 (Pa. Super. 2003) (citations omitted).

Forman argues the contents of his cell phone should have been suppressed because (1) he was illegally detained when he gave consent to search his cell phone, (2) his consent to the search was not voluntary, and (3) the scope of the search exceeded that to which he consented. We find these claims are either waived or meritless.

First, Forman argues suppression should have been granted because he was illegally detained when he gave consent to search his cell phone. Before addressing the merits of this claim, we must determine whether it is waived.

Our Supreme Court has held that when a trial court directs an appellant to file a concise statement of matters complained of on appeal, any issues not raised in such a statement will be waived. *See Commonwealth v. Lord*, 719 A.2d 306, 308 (Pa. 1998).

In his 1925(b) concise statement, Forman argued that he did not make a knowing and voluntary waiver of his rights regarding the search of his cell phone where he was not apprised of his *Miranda*[3] rights. *See* Petition to Amend Appellant's Pa.R.A.P. 1925(b) Statement, at 2.

In contrast, Forman argues on appeal that the trial court erred in denying the motion to suppress the contents of his cell phone where he was illegally detained. The question of whether a detention is legally justifiable is distinct and separate from the question whether a suspect is actually detained. Notably, while the lack of a *Miranda* warning is the main point of the claim framed in the concise statement, and accordingly the trial court analyzed the claim as such in its opinion, *Miranda* is not mentioned at all in the portion of Forman's appellate brief devoted to this claim. *See* Appellant's Brief, at 37-40.[4] Further, Forman's appellate argument focuses on the issue of whether he was subjected to a detention, but does not develop any argument to support his claim that the alleged detention was illegal. While Forman makes a passing

---

[3] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] *Miranda* is only discussed once in the entire appellate brief in relation to a separate argument. *See id*. at 42-43.

mention of the requirement of probable cause to support "a seizure[,]" he does not provide any analysis of the distinction between a custodial detention and an investigative detention. Nor does he provide any attempt to apply the standard of probable cause to the circumstances of this case. ***See***, ***e.g.***, ***Commonwealth v. Stevenson***, 832 A.2d 1123, 1127 (Pa. Super. 2003). Similarly, the trial court's opinion on appeal focuses solely on defending its finding that Forman "was not restrained in any way." Trial Court Opinion, 1/31/22, at 18. The trial court did not provide any analysis of whether the police were entitled to detain Forman.

Because the distinct issue of whether Forman's detention was legal was not raised in the concise statement, the issue on appeal is waived. ***Lord***, 719 A.2d at 308.

Next, Forman argues his consent to the search of his phone was not voluntary. Specifically, Forman concedes that he gave consent to search his phone, but contends the consent was not voluntary as he claims he was "in custody at the time he gave consent to search his phone." Appellant's Brief, at 41.

"A search warrant is not required where a person with the proper authority unequivocally and specifically consents to the search." ***Commonwealth v. Acosta***, 815 A.2d 1078, 1083 (Pa. Super. 2003) (citations and internal quotation marks omitted). "To establish a valid consensual search, the Commonwealth must first prove that the consent was

given during a legal police interaction." ***Commonwealth v. Bell***, 871 A.2d 267, 273 (Pa. Super. 2005) (citation omitted).

Here, Detective Leahan indicated that when he asked to look at Forman's phone, he did not consider Forman a suspect. ***See*** N.T., Pre-Trial Motions Via Video Conference, 5/24/2021, at 32. Rather, he was proceeding according to Forman's claim that the victim had been involved in a fight with three other women. ***See id***. Police never told Forman he could not leave nor made any other show of force towards Forman. ***See id***. at 39-40. The suppression court found this testimony to be credible. ***See id***. at 145. As we cannot re-weigh the evidence on appeal, this evidence was sufficient to establish that Forman was not in custody when he gave his consent to the search of his cell phone.

But this does not end our analysis, as Forman also challenges the suppression court's conclusion that his consent was voluntary pursuant to the totality of the circumstances. "To establish a voluntary consensual search, the Commonwealth must prove that a consent is the product of an essentially free and unconstrained choice - not the result of duress or coercion, express or implied, or a will overborne - under the totality of the circumstances." ***Commonwealth v. Randolph***, 151 A.3d 170, 179 (Pa. Super. 2016) (citation and internal quotation marks omitted).

At the suppression hearing, Detective Leahan testified that after arriving at the ER, he proceeded to the family consultation room where he came in

contact with Forman. *See* N.T., Pre-Trial Motions Via Video Conference, 5/24/2021, at 25. Forman had two cell phones with him at the time, and identified one as the victim's and one as his own. *See id*. at 25-26. Detective Leahan took custody of the victim's phone. *See id*. at 26. Detective Leahan asked Forman if he would provide consent to search his phone, to which Forman verbally agreed, without hesitation, and without any questions. *See id*. at 27.

Detective Long testified that she was called into the family consultation room to obtain consent from Forman. *See id*. at 36. Detective Long provided Forman with a consent form, which she filled out in his presence, read over and explained the form, and asked if Forman had any questions. *See id*. at 38. Forman did not have any questions and signed the consent form. *See id*. Without any prompting, Forman then volunteered his passcode and wrote the passcode on the bottom of the form. *See id*. at 38-39. No weapons were brandished, Forman was never told he could not leave, nor did he ask to end the interview, and his egress was never blocked. *See id*. at 39. At no point was Forman restrained in any manner. *See id*. at 40.

The trial court found the detectives' testimony credible and accordingly found the consent was voluntary. We agree with the trial court's conclusion and find Forman's somewhat scattered argument does not persuade us otherwise. Accordingly, Forman fails to demonstrate that his consent was not voluntarily given.

Finally, Forman argues the scope of the search exceeded that to which he consented. Specifically, Forman contends that even if his consent was voluntary, he believed he was only giving consent for the sole purpose of the detectives trying to get in contact with the victim's family.

Again, before addressing the merits of this claim, we must determine whether it is waived. "[A]ppellate review of an order denying suppression is limited to examination of the precise basis under which suppression initially was sought; no new theories of relief may be considered on appeal." *Commonwealth v. Little*, 903 A.2d 1269, 1272–73 (Pa. Super. 2006).

Although the burden in suppression matters is on the Commonwealth to establish "that the challenged evidence was not obtained in violation of the defendant's rights," Pa.R.Crim.P. 581(D), that burden is triggered only when the defendant "state[s] specifically and with particularity the evidence sought to be suppressed, the grounds for suppression, and the facts and events in support thereof." *Commonwealth v. McDonald*, 881 A.2d 858, 860 (Pa. Super. 2005). "Bald statements or boilerplate allegations of illegally obtained evidence are insufficient to trigger the Commonwealth's burden of going forward and proving that a search was legal." *McDonald*, 881 A.2d at 860; *see also Commonwealth v. Quaid*, 871 A.2d 246, 249 (Pa. Super. 2005) ("[W]hen a motion to suppress is not specific in asserting the evidence believed to have been unlawfully obtained and/or the basis for the

unlawfulness, the defendant cannot complain if the Commonwealth fails to address the legality of the evidence the defendant wishes to contest.").

Here, Forman included a blanket statement in his suppression motion, merely stating "the scope of said search was overly broad". Omnibus Pre-Trial Motion, 4/23/2021, at 2. Forman failed to include any other support for this bald allegation, nor cite to any facts in support of this claim. Further, when the Commonwealth and the trial court asked Forman to state, with specificity and particularity, his basis for requesting suppression on the record at the commencement of the suppression hearing, Forman did not raise such an argument. Nor did he develop this basis for suppression at any point during the remainder of the suppression hearing.

We find the burden of proof never shifted to the Commonwealth on this issue. Similar to the defendant in **McDonald**, Forman simply made a bald allegation, which he then failed to pursue in any meaningful way. As we find Forman abandoned his request, we conclude Forman waived this claim for our review. **See id**. at 860.

In his second issue on appeal, Forman contends the trial court abused its discretion by denying Forman's motion for a mistrial. Specifically, he argues he was deprived of a fair trial after the victim's family, in the presence of the jury, had a prejudicial emotional reaction to a key piece of evidence.

Our Supreme Court has explained:

> A trial court is required to grant a mistrial only where the alleged prejudicial event may reasonably be said to have deprived the

defendant of a fair and impartial trial. It is well-settled that the review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion.

An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will ... discretion is abused. A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. A mistrial is not necessary where cautionary instructions are adequate to overcome prejudice.

*Commonwealth v. Fortenbaugh*, 69 A.3d 191, 193 (Pa. 2013) (internal quotation marks and citations omitted).

Here, on the second day of trial, the Commonwealth entered a video into evidence that was taken from Forman's phone, just before midnight on February 2, 2020. The 14-second video depicts the victim laying outside on the grass, seemingly unconscious, with visible blood and injuries on her face. During the video, Forman can be heard saying "This is what a cheating liar gets," and additionally using vulgar language to describe the victim's character. Right after the video started playing before the jury, the victim's family began to cry and "wail loudly" in the courtroom. N.T., Trial By Jury - Day 2, 8/17/2021, at 263. In response, the court had to clear both the family and the jurors out of the courtroom. Outside the presence of the jury, Forman's counsel moved for a mistrial, which the court denied. Instead, the court, by agreement of defense counsel, gave a curative instruction to the jury. *See id*. at 265-268.

- 17 -

The curative instruction issued by the trial court was direct, unequivocal, and strong, informing the jury that they were not to consider the emotional outburst, and was sufficient to expunge any taint and assure a fair trial. Under the circumstances of this case, we find no abuse of discretion in the trial court's determination that a mistrial was not warranted.

In his third and final issue, Forman argues the evidence was insufficient to support his conviction for first degree murder. We are constrained to conclude Forman's sufficiency claim is waived, as his Rule 1925(b) statement did not adequately identify the errors that he intended to challenge on appeal.

It is well-established that any issue not raised in a Rule 1925(b) statement will be deemed waived for appellate review. **See Lord**, at 309. Further, an appellant's concise statement must identify the errors with sufficient specificity for the trial court to identify and address the issues the appellant wishes to raise on appeal. **See** Pa.R.A.P. 1925(b)(4)(ii) (requiring a Rule 1925(b) statement to "concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge"). A Rule 1925(b) concise statement that is too vague can result in waiver of issues on appeal. **See Commonwealth v. Dowling**, 778 A.2d 683, 686-687 (Pa. Super. 2001) ("a [c]oncise [s]tatement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no [c]oncise [s]tatement at all").

> If [an appellant] wants to preserve a claim that the evidence was
> insufficient, then the 1925(b) statement needs to specify the

element or elements upon which the evidence was insufficient. This Court can then analyze the element or elements on appeal. [Where a] 1925(b) statement [ ] does not specify the allegedly unproven elements[,] ... the sufficiency issue is waived [on appeal].

*Commonwealth v. Tyack*, 128 A.3d 254, 260 (Pa. Super. 2015) (citation omitted). Further, waiver applies even where the trial court addresses the issue in its Rule 1925(a) opinion and where the Commonwealth does not object to the defective Rule 1925(b) statement. *See Commonwealth v. Williams*, 959 A.2d 1252, 1257 (Pa. Super. 2008) ("The Commonwealth's failure and the presence of a trial court opinion are of no moment to our analysis because we apply Pa.R.A.P. 1925(b) in a predictable, uniform fashion, not in a selective manner dependent on an appellee's argument or a trial court's choice to address an unpreserved claim.") (citations omitted); *see also Commonwealth v. Roche*, 153 A.3d 1063, 1072 (Pa. Super. 2017).

Here, Forman's Rule 1925(b) statement simply includes a blanket statement, declaring the evidence was insufficient to convict him of first degree murder. *See* Petition to Amend Appellant's Pa.R.A.P. 1925(b) Statement, 12/22/2021, at 2. The statement fails to "specify the element or elements upon which the evidence was insufficient" to support Forman's conviction. As a result, we must conclude Forman's sufficiency of the evidence claim is waived on appeal. *See Williams*, 959 A.2d at 1257-1258.

Even if Forman had properly preserved this issue in his 1925(b) Statement, it would merit no relief.[5] Forman concedes that he acted with malice, but argues the evidence was insufficient to prove that he acted with the specific intent to kill, a necessary element of a first degree murder conviction. However, Forman's argument fails to acknowledge that specific intent to kill can be proven if the defendant knowingly applies deadly force to the person of another. *See Commonwealth v. Simmons*, 662 A.2d 621, 629 (Pa. 1995) (citation omitted). "Death caused by strangulation is sufficient to infer the specific intent required for a conviction of first degree murder." *Id.* (citations omitted).

Here, the record contains evidence that Forman had an argument with the victim and beat and strangled her until she became unresponsive. Forman

_____

[5] Our standard of review for a challenge to the sufficiency of the evidence is to determine whether, when viewed in a light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom are sufficient for the trier of fact to find that each element of the crimes charged is established beyond a reasonable doubt. *See Commonwealth v. Dale*, 836 A.2d 150, 152 (Pa. Super. 2003). "The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." *Commonwealth v. Bruce*, 916 A.2d 657, 661 (Pa. Super. 2007) (citation omitted).

"[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." *Id*. (citation omitted). "As an appellate court, we do not assess credibility nor do we assign weight to any of the testimony of record." *Commonwealth v. Kinney*, 863 A.2d 581, 584 (Pa. Super. 2004) (citation omitted). Thus, we will not disturb the verdict "unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." **Bruce**, 916 A.2d at 661 (citation omitted).

then left the victim unresponsive in his home for a full night and subsequent morning before finally taking the victim to the hospital. Viewed in the light most favorable to the Commonwealth as verdict winner, the evidence was sufficient for the jury to infer that Forman strangled the victim with the specific intent to kill her. *See id*. Accordingly, Forman's third and final issue fails, and we affirm the judgment of sentence.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/04/2023